**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 16-2116**

─────────────

GREENBRIER HOTEL CORPORATION, d/b/a The Greenbrier; THELMA R. ADKINS; WILLIAM ARNOLD; DENNIS AUSTIN; GREG SCOTT; ERIC TYGRETT,

     Plaintiffs – Appellees,

v.

UNITE HERE HEALTH, a trust; H.E.R.E.I.U. WELFARE FUND- PLAN UNIT 155, an employee welfare health plan; JOHN W. WILHELM; GEOCONDA ARGUELLO-KLINE; WILLIAM BIGGERSTAFF; DONNA DECAPRIO; MAYA DEHART; BILL GRANFIELD; TERRY GREENWALD; CONSTANCE M. HOLT; KAREN KENT; CLETE KILEY; C. ROBERT MCDEVITT; LEONARD O'NEILL; HENRY TAMARIN; DONALD TAYLOR; THOMAS WALSH; PAUL ADES; JAMES M. ANDERSON; RICHARD M. BETTY; ALBERT I. CHURCH; JAMES L. CLAUS; RICHARD ELLIS; GEORGE GREENE; ARNOLD F. KARR; CYNTHIA KISER MURPHY; RUSS MELARAGNI; FRANK MUSCOLINA; WILLIAM NOONAN; JACK M. PENMAN; JOHN SOCHA; HAROLD TAEGEL; GARY WANG,

     Defendants – Appellants.

─────────────

**No. 17-1720**

─────────────

GREENBRIER HOTEL CORPORATION, d/b/a The Greenbrier; THELMA R. ADKINS; WILLIAM ARNOLD; DENNIS AUSTIN; GREG SCOTT; ERIC TYGRETT,

     Plaintiffs – Appellees,

v.

UNITE HERE HEALTH, a trust; H.E.R.E.I.U. WELFARE FUND- PLAN UNIT 155, an employee welfare health plan; JOHN W. WILHELM; GEOCONDA ARGUELLO-KLINE; WILLIAM BIGGERSTAFF; DONNA DECAPRIO; MAYA DEHART; BILL GRANFIELD; TERRY GREENWALD; CONSTANCE M. HOLT; KAREN KENT; CLETE KILEY; C. ROBERT MCDEVITT; LEONARD O'NEILL; HENRY TAMARIN; DONALD TAYLOR; THOMAS WALSH; PAUL ADES; JAMES M. ANDERSON; RICHARD M. BETTY; ALBERT I. CHURCH; JAMES L. CLAUS; RICHARD ELLIS; GEORGE GREENE; ARNOLD F. KARR; CYNTHIA KISER MURPHY; RUSS MELARAGNI; FRANK MUSCOLINA; WILLIAM NOONAN; JACK M. PENMAN; JOHN SOCHA; HAROLD TAEGEL; GARY WANG,

          Defendants – Appellants.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Irene C. Berger, District Judge (5:13-cv-11644)

---

Argued:  October 24, 2017                  Decided:  January 3, 2018

---

Before WILKINSON, DUNCAN, and AGEE, Circuit Judges.

---

Affirmed in part and vacated in part by unpublished opinion.  Judge Duncan wrote the opinion in which Judge Wilkinson and Judge Agee joined.

---

**ARGUED:** Ian Hugh Morrison, SEYFARTH SHAW LLP, Chicago, Illinois, for Appellants.  Kimberly Grace Kessler Parmer, MASTERS LAW FIRM, LC, Charleston, West Virginia, for Appellee.   **ON BRIEF:** Robert J. Carty, Jr., SEYFARTH SHAW LLP, Houston, Texas; Charles M. Love, III, BOWLES RICE, LLP, Charleston, West Virginia, for Appellants.  Marvin W. Masters, MASTERS LAW FIRM, LC, Charleston, West Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

2

DUNCAN, Circuit Judge:

UNITE HERE HEALTH and its codefendants (the "Fund") appeal the district court's determination that the Fund breached its fiduciary duty under the Employee Retirement Income Security Act of 1975 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, as amended. The Fund also appeals the district court's award of attorney's fees and costs. For the reasons that follow, we affirm only the district court's judgment that the Fund was required to remit excess assets to the Greenbrier's new employee welfare trust fund. However, we affirm on non-ERISA grounds and thus vacate the district court's award of attorney's fees and costs.

I.

Because the disposition of this case is highly fact-dependent, we recount in detail first the background of this litigation and then its procedural history.

A.

We first briefly explain the context of the dispute between the Greenbrier and the Fund, then detail the Greenbrier's agreement with the Fund with particular attention to the documents that structure their contractual relationship.

1.

The seeds of the current dispute were sown in 2004 when the Greenbrier and the Fund entered into an agreement by which the Fund would provide healthcare benefits to

3

eligible Greenbrier employees and their dependents.[1]  The Greenbrier is a hotel and resort located in White Sulphur Springs, West Virginia.  The Fund is a Taft-Hartley employee welfare benefit fund governed by ERISA, which in 2004 was affiliated with the Hotel Employees and Restaurant Employees International Union ("HEREIU").  At that time, a local union affiliated with HEREIU represented certain unionized Greenbrier employees.  The Greenbrier and its HEREIU-affiliated employees negotiated an agreement by which the Fund would provide healthcare coverage for these employees.  When the Greenbrier joined the Fund, it was known as the HEREIU Welfare Fund.

In 2009 and 2010, a bitter union dispute split HEREIU into two factions: UNITE HERE and the Service Employees International Union ("SEIU").  UNITE HERE inherited the HEREIU Welfare Fund and renamed it UNITE HERE HEALTH.  The split divided local unions, and the Fund Trustees voted in 2009 to amend the Trust Agreement such that local unions that disaffiliated with UNITE HERE would no longer be welcome in the Fund.  SEIU and UNITE HERE negotiated a settlement between themselves governing which bargaining units would be permitted to remain in the Fund.  The Greenbrier local was one such group that affiliated with SEIU rather than UNITE HERE after the split; thus the Greenbrier was forced to leave the Fund.  In October 2010, the Fund informed the Greenbrier that, pursuant to the dueling unions' settlement, the

---

[1] Just as we use "the Fund" as a shorthand throughout to describe the UNITE HERE Health Fund and its 33 Trustee codefendants, we use "the Greenbrier" throughout to refer to the Greenbrier and its union-affiliated employee coplaintiffs unless the context of the discussion provides otherwise.

Greenbrier's participation in the Fund would be terminated on January 31, 2013, which was when the Greenbrier's collective bargaining agreement was set to expire.

In short, the Greenbrier entered the Fund voluntarily in 2004 and left involuntarily in 2013. The parties fundamentally disagree about the consequences that flow from the termination of their relationship.

2.

The Fund is a single ERISA plan for tax and organizational purposes. However, the Fund is composed of several administrative units called "plan units," which are distinct for underwriting purposes. Each plan unit has its own administrative and eligibility rules and its own rate and benefit structure. The Fund designates different plan units for different employer groups because different geographic locations generate different health-care costs, and premiums are calculated accordingly. Contributions from employers and employees participating in each plan unit are all pooled into a single trust, and payments for claims are made from those pooled assets.

Before the Greenbrier joined the Fund, all plan units within the Fund contained participants from multiple employers. For example, a plan unit might include employees of several different Las Vegas casinos, and the premiums and benefits offered to these employees from multiple employers would be underwritten as a single plan unit based on health-care costs in the Las Vegas area.

The Greenbrier reasoned that a plan underwritten based on predicted healthcare costs in a distant city would not serve its interests given its differing local economic

5

conditions. Thus, the Greenbrier successfully negotiated that, as a condition of entering the Fund, it would be assigned its own plan unit, which would contain only Greenbrier employees and which would be underwritten independently.

This resulting Greenbrier plan unit, Plan Unit 155, had its own administrative and eligibility rules, its own rate and benefit structure, and its own plan documents, including rules and regulations (the "2004 Rules and Regulations" and, later, the "2009 Rules and Regulations"). Greenbrier employee participants received their own Summary Plan Description (the "SPD") as well, which summarized Plan Unit 155's terms and benefits. All plan units within the Fund, including Plan Unit 155, were subject to a single "Trust Agreement," the principal controlling document within the Fund. At the time the Greenbrier entered Plan Unit 155, the Trust Agreement in force was the "Sixth Amended Trust Agreement."

Significantly, the parties' Participation Agreement memorialized the special agreement between the Greenbrier and the Fund, stating that "The Greenbrier will be underwritten as an independent plan unit with the Welfare Fund." Furthermore, "[o]nly the claims utilization of The Greenbrier Plan . . . will be used in calculating future rates for The Greenbrier." The Participation Agreement also incorporated by reference the terms and conditions of the Trust Agreement and the Plan Unit 155 Rules and Regulations, explaining that "[a]ny provision in this [Participation] Agreement that is inconsistent with the [Trust Agreement], or the Plan of Benefits, rules or procedures established by the Trustees shall be null and void."

6

Of particular relevance here, Plan Unit 155's 2004 Rules and Regulations specified how excess assets would be distributed if Plan Unit 155 were terminated. Section 12 of the 2004 Rules and Regulations provides two options for excess assets after termination:

> If there are any excess assets remaining after the payment of all Plan liabilities, those excess assets will be used for purposes consistent with the purpose of the Plan as determined by the Trustees, or they may be transferred to another employee benefit fund providing similar benefits.

The Definitions section of the 2004 Rules and Regulations further explained that capitalized words had "a defined meaning" as set forth in the Definitions section, while other words and phrases not so designated "shall have their regular meanings." In the preceding passage, the word "Plan" is a capitalized, and thus defined, term. "Plan" thus means "[t]he plan, program, method, and procedure adopted by the Trustees for Eligible Employees and covered Dependents of Plan Unit 155 for the payment of" health care benefits.[2] In 2009, a second version of the Plan Unit 155 Rules and Regulations superseded the original version. However, the termination provision of the 2009 Rules and Regulations remained identical to that in the 2004 Rules and Regulations, except that the sections were renumbered such that the termination provision appeared in section 11.

The Trust Agreement also contained a termination provision, but it spoke only to the termination of the Fund overall, not to the termination of individual plan units. The

---

[2] The Fund argues that we should read "Plan" to mean something other than Plan Unit 155, but we find the terms of the Rules and Regulations document crystal clear on this point.

7

Trust Agreement also contained an anti-inurement provision, which provided that "[n]o portion of the Welfare Fund shall ever revert to or inure to the benefit of any Employer or Union, or to be used for or diverted to purposes other than for the exclusive benefit of Participants and their Beneficiaries, except as permitted by ERISA."

Between the union split in 2009 and the termination of Plan Unit 155 in early 2013, representatives from the Greenbrier raised the issue of the dispensation of excess assets several times with Fund representatives. A Greenbrier representative explained that, based on her participation in the initial negotiations for the Greenbrier to join the Fund and her reading of the termination provision, she understood that the Greenbrier could retrieve excess assets because of its independence from other Fund participants and its unique plan unit structure.

The Fund's responses are the subject of some dispute. Peter Bostic, the Greenbrier's union representative and a Fund Trustee from 2004 through 2010, reported that the Fund's CFO, Kevin Gittens, had informed him that excess assets would remain with the Fund if the Greenbrier chose to *withdraw* but that the Plan language required excess assets be used to provide benefits for Greenbrier employees if Plan Unit 155 were *terminated*. Gittens later testified that he had always maintained that assets would remain with the Fund, though when questioned before the district court about details of his conversations about the dispensation of excess assets, his responses were vague.[3]

---

[3] Though Gittens testified that he would not have said that excess assets could be returned to a departing employer, the district court found Bostic's testimony more credible based on the specificity of his recollection and the demeanor of each witness.

A Greenbrier representative sent a letter to the Fund requesting plan documents and an accounting of contributions and excess assets. Approximately two weeks later, the Fund replied with a copy of the Seventh Amended Trust Agreement and a letter indicating that the Fund had no intention of returning excess assets or sharing any information about possible excess assets with the Greenbrier. The letter stated: "The amount of excess assets over liabilities in any particular plan unit is information that is not shared with contributing employers. The Trustees retain exclusive authority on use of any excess assets. Further, the Fund does not know if there will be any excess assets at the time of termination." The Fund never provided a detailed accounting of Plan Unit 155's excess assets.

Over the same period, the Fund initiated several amendments to many of the key documents related to Plan Unit 155. In October 2012, Trustees of the Fund adopted the Seventh Amended Trust Agreement, which in part removed language from the Sixth Amended Trust Agreement indicating that the Trustees acted as fiduciaries at all times and for all activities. This purportedly freed the Fund to make other changes without conflicting with their fiduciary responsibilities.

Of even greater significance, Fund Trustees amended Plan Unit 155's Rules and Regulations by mail ballot in December 2012. The amendment altered the termination provision of the 2009 Rules and Regulations, which had previously required excess assets to be used for purposes consistent with the Plan. After amendment, the provision read:

> If there are any excess assets remaining after the payment of all Plan liabilities, those excess assets will be used for purposes consistent *with the purposes of the Trust Agreement as determined by the Trustees*, *including*

9

> *the transfer of such excess assets to another Plan providing similar benefits.*

(Emphasis added). As highlighted in the preceding passage, the amendment had the effect of requiring excess assets be used for purposes consistent with "the purposes of the Trust Agreement" rather than the "purpose of the Plan" and allowed the transfer of excess assets to "another Plan" instead of "another employee benefit fund providing similar benefits." Thus, on the eve of the Greenbrier's departure from the Fund and the termination of Plan Unit 155, the Fund Trustees changed the terms governing disposition of excess assets in the Greenbrier's plan unit.

The Fund terminated Plan Unit 155 on January 31, 2013, and the Fund ceased paying claims for Greenbrier employees on February 1, 2013. Former participants in Plan Unit 155 received benefits through a new, self-insured plan established by the Greenbrier with claims paid out of the Greenbrier's general operating account. The Greenbrier also formed the New Greenbrier Trust to receive the excess assets from Plan Unit 155 and from which to pay qualifying health claims. On May 10, 2013, the Greenbrier sent the Fund a letter demanding transfer of excess assets from Plan Unit 155. On May 17, 2013, the Greenbrier and coplaintiff employees who participated in Plan Unit 155 sued the Fund, arguing that excess assets from Plan Unit 155 should be deposited into the New Greenbrier Trust.

B.

In its complaint, the Greenbrier alleged multiple grounds for relief, including breach of fiduciary duty claims under ERISA brought separately on behalf of plan participants (count I) and the Greenbrier (count II), federal common law claims for restitution (count III), violations of the Labor Relations Management Act (count IV), and state law claims for breach of contract (count V), unjust enrichment (count VI), and money had and received (count VII).

The Fund moved to dismiss the complaint, and the district court granted its motion in part on December 19, 2013. *Greenbrier Hotel Corp. v. UNITE HERE HEALTH*, No. 5:13-cv-11644 (S.D. W. Va. Dec. 19, 2013), ECF No. 35. In its opinion, the district court dismissed all claims except for the two ERISA fiduciary-breach claims, reasoning that all of the Greenbrier's other claims, including for breach of contract, were preempted by ERISA because they "relate to" an ERISA plan. *Id.* at 18. Because the details of the district court's reasoning weigh heavily on our analysis below, we recount the court's analysis at some length:

> Finally, the Defendants assert that the Plaintiffs' state law claims found in Counts V, VI, and VII are preempted under ERISA's framework because they "relate to" an ERISA plan. . . .
> The Plaintiffs respond that they only assert their state law claims in the alternative, and propose that these claims are appropriate when viewed under the proper standard of conflict preemption, as opposed to complete preemption. . . . The Defendants reply simply that the Fourth Circuit has flatly rejected the Plaintiffs' position in *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410 (4th Cir. 1993).
> Even a cursory review of the case law relating to ERISA plans and state law claim preemption reveals that the Defendants are correct. It is clear that a state law claim will "relate to" ERISA if it has a connection with, or reference to, such a plan. See *Shaw v. Delta Air Lines, Inc.*, 463

11

U.S. 85, 96-97 (1983). . . . Of paramount importance to courts and the sole dispositive factor determining whether ERISA preemption applies is whether the state law claims "relate to" the ERISA plan at issue. [citing to *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54 (1987).] If they do, they are customarily preempted, whether pleaded in the main or in the alternative.

*Id.* at 17–18 (internal footnotes omitted). The district court then pointed the Greenbrier to the Supreme Court's holding in *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), in support for its conclusion that "ERISA's preemptive scope applies even when such a finding would leave a gap in the plaintiffs['] available relief." *Id.* at 18 n.13. The district court dismissed all counts of the complaint with prejudice except for the ERISA claims for breach of fiduciary duty brought by the Greenbrier and the Greenbrier employee participants in the Fund.

Next, both parties filed motions for summary judgment, which the district court addressed in an opinion issued on September 24, 2015. *Greenbrier Hotel Corp. v. UNITE HERE HEALTH*, No. 5:13-cv-11644, 2015 WL 5626514 (S.D. W. Va. Sept. 24, 2015). The court decided only one issue at the summary-judgment phase: whether the Greenbrier was an ERISA fiduciary. This was an essential holding because if the Greenbrier were not an ERISA fiduciary, it would have no standing to bring its remaining claim for breach of fiduciary duty. *See id.* at *9. The district court determined that the Greenbrier was a fiduciary because it:

(i) exercised fiduciary control over plan assets--contributions--before they were remitted to the Fund; (ii) regularly audited employment rolls to ensure that correct amounts of contributions were being remitted and that only participants and their beneficiaries were receiving benefits from the Fund, and (iii) had a continuing duty to monitor the Trustees of the Fund once it became a party to the Trust Agreement.

12

*Id.* at \*10. The district court reasoned that, though the Greenbrier would not "automatically" achieve fiduciary status based on its assumption of these roles, the fact that the Greenbrier sued "in relation to its (and their) responsibilities to ensure adequate funding for the Plan" created fiduciary status for the purpose of this lawsuit. *Id.* Because the district court deemed the Greenbrier a fiduciary, it allowed the Greenbrier's claims for breach of fiduciary duty under ERISA to proceed to the merits stage.

The district court conducted a bench trial, at which it considered Plan Unit 155's plan documents, including the SPD provided to plan participants, and extensive live testimony. The evidence presented largely focused on the contractual relationship between the Fund and the Greenbrier and provided contrasting opinions on the interpretation of the parties' agreements. For example, even testimony "on the appropriate response from a fiduciary under the circumstances presented by this case" included an opinion from the Greenbrier's expert that "the Plan documents, read together, unambiguously required the transfer of surplus assets to the participants of Plan 155." *Greenbrier Hotel Corp. v. UNITE HERE Health*, No. 5:13-cv-11644, 2016 WL 9779134, at \*8 (S.D. W. Va. Aug. 26, 2016). The Fund's experts, in contrast, testified that "it was appropriate for the Trustees to override the language in the [SPD] if it required transfer, based on the language of the Trust Agreement requiring funds to be used to benefit participants" and that in fact "it would be a breach of fiduciary duty for the trust to use their assets to benefit non-participants." *Id.* (citing expert). Thus, even on the core question of fiduciary breach, the responses sounded in contract.

13

The district court concluded first that the Fund Trustees' last-minute amendment to the Plan Unit 155 Rules and Regulations "was unreasonable, discriminatory, in bad faith, and made in violation of the Plan's amendment procedures." *Id.* at \*12. Analyzing the remaining plan documents, the court determined that "the Plan language unambiguously requires transfer of the funds upon termination" and that "any decision of the Trustees not to do so constitute[d] an abuse of discretion." *Id.* Accordingly, the district court held that "the Trustees of the UNITE HERE Health [F]und breached their fiduciary duties by failing to transfer the surplus assets associated with Plan Unit 155 to the New Greenbrier Trust." *Id.* at \*14. The Fund refused to provide an accounting of the Plan Unit 155 surplus, arguing that Plan Unit 155 was merely an administrative unit and that there were, in fact, no such "excess assets" since the Fund pooled all contributions. The Greenbrier's accountant calculated the value of the surplus at $5,503,181 at the time that the Greenbrier left the Fund, and the district court accepted this number in its findings of fact and awarded this sum to the Greenbrier. *Id.* The district court also found that since the Fund had acted in bad faith in seeking to amend Plan Documents before the Greenbrier left the Fund, payment of attorney's fees and costs pursuant to ERISA § 502(g) was appropriate. *See* ERISA § 502(g), 29 U.S.C. § 1132(g). The Fund appealed.

The parties then submitted documentation of their positions on costs and fees, and the district court awarded the Greenbrier $1,677,594.58 in attorney's fees and expenses in a subsequent opinion and order. *Greenbrier Hotel Corp. v. UNITE HERE HEALTH*, No.

14

5:13-cv-11644, 2017 WL 2058222, at *6 (S.D. W. Va. May 12, 2017). The Fund also appealed the award of these fees and costs.

II.

When reviewing a judgment resulting from a bench trial, we examine conclusions of law de novo and factual findings for clear error. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 357 (4th Cir. 2014).

In general, the district court's fact-finding was meticulous, extensive, and free from clear error. Unfortunately, however, the district court made an error of law at the outset that infected the subsequent proceedings. Disposition of this appeal requires us to unravel the consequences.

At an early stage in this proceeding, the district court concluded that ERISA preempted the Greenbrier's state-law claims. Subsequently, the district court and the parties characterized the key issue in this case as whether the Fund breached a fiduciary duty to the Greenbrier under ERISA and structured their arguments accordingly. The district court purported to find that the Fund breached a fiduciary duty owed to the Greenbrier, when really it grounded its analysis in the terms of the parties' agreement. We conclude, however, that the Greenbrier did not present a cognizable claim under ERISA and that instead the case should have proceeded as a state-law breach-of-contract suit.

Ordinarily, we might vacate and remand such a case. This case, however, is not ordinary. Despite the surface-level trappings of ERISA fiduciary-duty claims, the

15

analytic arguments presented by *both parties* turn out to be garden-variety contract-based claims dressed in ERISA clothing. When we peek behind these muddled ERISA arguments, we discover a mislabeled--but straightforward--contract interpretation case. This conclusion is bolstered by the fact that contract-based arguments permeated the briefing and oral argument of both parties. Most critically, the district court's detailed and extensive findings provide all of the facts necessary to our legal analysis. Accordingly, we need not remand to settle the parties' dispute.

In the discussion that follows, we first clarify the district court's error in concluding that the Greenbrier's state-law claims were preempted by ERISA. Next, we explain how the parties have been arguing this case as a contract case all along, which provides us with sufficient information to affirmatively decide this case. Applying contract law to the facts at hand, we reach the same conclusion as the district court, though on alternative legal grounds. Accordingly, we affirm only the district court's judgment that the Fund must remit the balance of Plan Unit 155's surplus of $5,503,181 to the New Greenbrier Trust. However, because we reach this decision on grounds outside of ERISA's statutory scheme, we vacate the district court's award of attorney's fees and costs imposed under ERISA § 502(g).

A.

In order to explain the district court's errors of law, we must first wade into the murky waters of ERISA preemption, a field of law both complex and contentious. In the sections that follow, we first explain the relevant legal standard for ERISA preemption,

16

then discuss how the district court erred in its preemption analysis. Next, we conclude that, applying the correct legal standard, the Greenbrier's state-law claims were not preempted by ERISA. Finally, we describe how, despite holding the contract claims preempted, the district court's opinion actually offered a contract-based analysis.

1.

ERISA § 514, 29 U.S.C. § 1144, provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA, so long as those laws do not fall into a narrow category of exemptions. In short, this so-called "preemption clause" states--in deceptively simple terms--that, with a few exceptions, laws that "relate to" any ERISA plan are preempted. The Supreme Court's interpretation of this provision has experienced a sea change over time, moving from an expansive, field-preemption scope in the early 1980s toward a narrower, conflict-preemption approach in more recent decades. This evolution affects the outcome here.

In the 1980s, a line of Supreme Court cases construed § 514's "relate to" language in the broadest possible fashion. In 1983, the Court explained in *Shaw* that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." 463 U.S. at 96–97. In a subsequent case, the Court described *Shaw* as highlighting the "broad scope of the pre-emption clause" and clarifying that the "relate to" provision had "its broad common-sense meaning." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985). *Pilot Life* further

17

extended this analysis in 1987 to include preemption of state common-law tort and contract actions brought by a plan beneficiary against his plan administrator for improperly processing the beneficiary's claims. 481 U.S. at 43–44, 57. In short, from *Shaw* to *Pilot Life*, the Court interpreted ERISA's scope of preemption as nearly all-encompassing, preempting nearly everything that could be said to "relate to" an ERISA plan under the ordinary meaning of that term.

However, the Court has since retreated, noting that it had "to recognize that our prior attempt to construe the phrase 'relate to' does not give us much help drawing the line" for preemption and explaining that it was necessary to "go beyond the unhelpful text and the frustrating difficulty of defining [§ 514's] key term." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995). In *Travelers*, the Court explained that congressional intent was the key consideration in interpreting the preemptive effect of the statute and that the Court "worked on the 'assumption that the historic police powers of the States were not to be superseded by Federal Act unless that was the clear intent of Congress.'" *Id.* at 655 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). *Travelers* narrowed the impact of § 514 to areas where Congress clearly intended to preempt state law, including where state law would "mandate[] employee benefit structures or their administration," "bind plan administrators to a particular choice," "provid[e] alternative enforcement mechanisms," or "preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one." *Id.* at 658–60.

18

Though *Travelers* did not explicitly overturn prior cases like *Shaw* or *Pilot Life*, it signaled the abandonment of the criteria for evaluating ERISA preemption used in those cases, especially the notion that one could "apply faithfully the statutory prescription" that all laws that "relate to" ERISA are preempted without looking to congressional intent. *Cal. Div. of Labor Stds. Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 319, 335 (1997) (Scalia, J., concurring). Justice Scalia characterized the pre-*Travelers* standard as "a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Id.* Shortly after *Dillingham*, the Court reconfirmed that *Travelers* precluded "an expansive and literal interpretation of the words 'relate to' in § 514(a)" when it reversed a Second Circuit case in which that court had "fail[ed] to give proper weight to *Travelers*' rejection of a strictly literal reading of § 514(a)." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 812–13 (1997).

Thus, following *Travelers*, courts may no longer rely on a "strictly literal reading" of § 514's "relate to" language to determine whether a state law is preempted by ERISA. *Id.* at 813. Instead of preempting all state actions that even tangentially touch ERISA plans, conflict preemption applies. A court must determine whether a conflict exists such that Congress clearly intended to preempt the law in question. As the Supreme Court has made clear, ERISA's principal goal "is to protect plan participants," not plan sponsors. *See Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 946 (2016) (quoting *Boggs v. Boggs*, 520 U.S. 833, 845 (1997)); *see also* ERISA § 2, 29 U.S.C. § 1001 (congressional findings and declaration of policy). If the state law falls within the field of laws that have

19

traditionally been "occupied by the States," then the party arguing for preemption must "bear the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'" *De Buono*, 520 U.S. at 814 (quoting *Hillsborough Co. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715 (1985); *Travelers*, 514 U.S. at 654).

This circuit explicitly noted the post-*Travelers* shift in ERISA preemption analysis in *Coyne & Delany Co. v. Selman*, where we applied a conflict-preemption analysis to conclude that ERISA did not preempt a "garden-variety malpractice claim" brought by a plan sponsor against a plan administrator in its professional capacity because the claim did not "implicate the relations among the traditional ERISA plan entities." 98 F.3d 1457, 1460, 1469–70 (4th Cir. 1996). Thus, to determine whether ERISA preempts a claim, a court must determine whether Congress so intended.

In addition to this evolving standard for *substantive* ERISA preemption, a parallel line of cases developed the law on the related--but doctrinally distinct--issue of preemption as a *jurisdictional* inquiry for purposes of removal to federal court. This distinct jurisdictional inquiry requires analysis under the "complete preemption doctrine," as opposed to the "conflict preemption doctrine," because even a case implicating a state law that *conflicts* with ERISA is not "properly removable to federal court" unless that state law is *also* "'completely preempted' by ERISA's civil enforcement provision, § 502(a)." *Sunoco Prods. Co. v. Physicians Health Plan, Inc.*, 338 F.3d 366, 371 (4th Cir. 2003) (quoting *Darcangelo v. Verizon Commc'ns, Inc.*, 292 F.3d 181, 187 (4th Cir. 2002)); *see also Davila*, 542 U.S. at 217–18; *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 62,

63 (1987); *Custer*, 12 F.3d at 420–23. However, because here the ERISA preemption issue is substantive, not jurisdictional, a conflict preemption analysis properly applies.

2.

Here, the district court's error in its preemption analysis falls into two categories: (1) applying only the now-defunct pre-*Travelers* preemption analysis and (2) confusing the jurisdictional doctrine of complete preemption with the substantive doctrine of conflict preemption.

First, the district court applied precisely the type of literal analysis of the term "relate to" from ERISA § 514 prohibited by *Travelers*, *Dillingham*, and *De Buono*. For example, the district court explained that "[e]ven a cursory review of the case law relating to ERISA plans and state law claim preemption reveals that [the Greenbrier's state law claims are preempted because] a state law claim will 'relate to' ERISA if it has any connection with, or reference to, such a plan." *Greenbrier Hotel Corp. v. UNITE HERE HEALTH*, No. 5:13-cv-11644, at 17 (S.D. W. Va. Dec. 19, 2013) (quoting *Shaw*, 463 U.S. at 96–97). The court continued: "Of paramount importance to courts and *the sole dispositive factor determining whether ERISA preemption applies* is whether the state law claims "relate to" the ERISA plan at issue." *Id.* at 18 (citing *Pilot Life*, 481 U.S. at 54) (emphasis added). The court did not analyze whether Congress intended to preempt the Greenbrier's state-law claims, nor did it cite *Travelers* or any subsequent case in the *Travelers* line. Accordingly, we conclude that the district court mistakenly

21

applied a defunct test for ERISA preemption that is precluded by the binding precedent of both the Supreme Court and this circuit.

Second, the remainder of the district court's preemption analysis confused ERISA preemption analysis on substantive grounds, in which the doctrine of conflict preemption applies, and on jurisdictional grounds, in which the doctrine of complete preemption applies. The district court counterpoised the doctrines of conflict and complete preemption as opposing choices, and, reading *Custer*, determined that the Fourth Circuit had "flatly rejected" conflict preemption analysis altogether. *Id.* at 17. Here, however, the Greenbrier and the Fund face no such jurisdictional quandary.[4] Thus, the district court incorrectly asserted that a "complete preemption" analysis applied.

Here, the district court should have analyzed the Greenbrier's state-law claims through a conflict preemption lens to determine whether Congress intended for ERISA to preempt the Greenbrier's claims. Because the field of general contract law falls within the field of law traditionally occupied by the States, the Fund should have been held to the burden of overcoming the presumption that Congress did not intend to supplant state law. The district court thus erred in relying instead on a literal reading of the phrase "relate to" in ERISA § 514(a) and in confusing case law on preemption for federal removal and preemption as a substantive matter.

---

[4] The Greenbrier asserted both federal-question and diversity jurisdiction in its original complaint.

22

## 3.

We find that the Greenbrier's state-law claims were not preempted. First, as noted above, general contract law is a field of law traditionally occupied by the states, and thus we presume that Congress did not intend to interfere in this area absent clear evidence to the contrary. Upon examination of the specific facts found by the district court, we do not find sufficient evidence to conclude that Congress intended for ERISA to preempt the Greenbrier's state-law claims.

The agreement between the Greenbrier, an employer and ERISA plan sponsor, and the Fund, an ERISA plan, formed an ordinary contractual relationship. Enforcing the terms of their agreement does not implicate the regulation of, administration of, or benefits provided under ERISA plans more generally.

Rather, the Greenbrier is suing the Fund for reneging on the agreement it negotiated as a plan sponsor. The action only tangentially relates to an ERISA plan. This is a two-party dispute, and the resolution of this suit on contract grounds does not implicate other relationships regulated by ERISA or overlap with ERISA's remedial scheme, which contemplates only claims brought by plan participants, beneficiaries, fiduciaries, and the Secretary of Labor--not plan sponsors. *See* ERISA §§ 502(a)(2), 502(a)(3), 29 U.S.C. §§ 1132(a)(2), 1132(a)(3). Accordingly, ERISA does not preempt the Greenbrier's state-law contract claims.

4.

The unusual circumstances presented by the legal argumentation at all stages of this dispute conflated contract analysis with analysis of fiduciary duties.

First, the consequences of the district court's confusion spilled into the issue of whether the Greenbrier had standing to sue under ERISA at the summary judgment stage. Employers are generally considered "plan sponsors" or, in the language of trust law, "settlors" of ERISA plans--not fiduciaries. *See* 29 U.S.C. § 1002(16)(B) (defining plan sponsor as the employer that established or maintained the employee benefit plan); *see also Selman*, 98 F.3d at 1464 & n.8 (explaining employers' settlor and plan-sponsor roles under ERISA).

The Greenbrier argued that it was a fiduciary because it claimed to exercise three fiduciary functions: (1) control over employee contributions before remittance to the Fund; (2) responsibility to audit employment rolls to assure benefits were being paid only to entitled beneficiaries; and (3) a general duty to monitor the Fund and its Trustees. As we explained in *Selman*, a plan sponsor may also be a fiduciary for certain purposes, but "a plan sponsor does not become a fiduciary by performing settlor-type functions such as establishing a plan and designing its benefits." *Id.* at 1465. Here, we do not see how the fiduciary functions claimed by the Greenbrier distinguish the Greenbrier from any other ERISA plan sponsor.

Following the bench trial, the district court purported to decide the case as a breach of fiduciary duty under ERISA. *See Greenbrier Hotel Corp.*, 2016 WL 9779134, at *15. In determining whether a fiduciary has breached its duty, a court must inquire

24

into whether that "ERISA fiduciary [has] discharge[d] his responsibility 'with the care, skill, prudence, and diligence' that a prudent person 'acting in a like capacity and familiar with such matters' would use," as required by ERISA § 404(a). *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (quoting ERISA § 404(a)(1), 11 U.S.C. § 1104(a)(1)); *see also Tatum*, 761 F.3d at 357–61 (analyzing a purported breach of fiduciary duty under ERISA). At minimum, we would expect this inquiry to include an analysis of what the "prudent man standard of care" in ERISA § 404(a) would require in the case before the court, followed by a comparison between this standard of care and the level of care actually exercised by the fiduciary charged with breaching its fiduciary duty.

To the contrary, the parties here appear to have confused breach of contract with breach of fiduciary duty. For example, both parties' expert witnesses opined on the meaning of various passages in the parties' documents and quarreled over which provisions controlled dispensation of excess funds. *See Greenbrier Hotel Corp.*, 2016 WL 9779134, at \*8. This is contract interpretation, not elucidation of the Fund's fiduciary duties.

These confused contract-based arguments muddled the district court's legal analysis.[5] Tellingly, the district court's opinion contains virtually no reference to a fiduciary "standard of care." Instead, much of the court's opinion interpreted the contractual requirements of the plan documents and the contractual expectations and

---

[5] For example, the opinion recites the standard ordinarily used for ERISA denial-of-benefits cases brought under § 502(a)(1)(B), which we note is *not* the correct standard for analyzing an ERISA fiduciary breach under § 502(a)(2) or § 502(a)(3). *See id.* at \*13.

responsibilities of each party. *See id.* at \*10–12. However, the opinion also memorializes the district court's contract-based reasoning, which reveals that the court's misstatement of law did not taint its fundamental conclusions in this case. The district court explained that it viewed the case "narrowly" and that it believed the Greenbrier was entitled to the excess funds because of "unambiguous Plan language." *Id.* at \*14. The court held that "no general principle or case law . . . either requires or prohibits the transfer of assets in these circumstances" and that it was "the unique structure of the Fund, and Plan [Unit] 155 [that made] the return of excess assets practical in this case." *Id.* We interpret this section of the district court's opinion as stating that its assignment of damages in this case is based not on a cosmic standard of care for fiduciaries or some other legal requirement, but on the contractual relationship between the Greenbrier and the Fund that led to the creation of Plan Unit 155. The district court's erroneous statements of law aside, we read the bulk of the opinion as presenting a careful assessment of disputed contractual provisions resulting in a conclusion grounded in the terms of the parties' agreement.

The dispute between the Greenbrier and the Fund is therefore, at its core, a relatively simple contract dispute. In essence, the Fund and the Greenbrier disagree about what happens to Plan Unit 155's excess assets under the terms of the parties' agreement, as recorded in the Trust Agreement, Participation Agreement, and Plan Unit 155 Rules and Regulations. The next section examines these contractual arguments.

26

B.

Having found that the Greenbrier's state-law claims were not preempted, we now proceed to consideration of the parties' dispute on the merits.

The parties disagree both about which contract provision controls this dispute and the context in which the court should consider this provision. We summarize below the arguments that each party puts forth to support its reading of the contractual documents' terms in this appeal. Then, we conclude, like the district court, that the Greenbrier's reading is the more persuasive.

1.

On appeal, the Fund hangs its hat on the Trust Agreement's anti-inurement provision, which states that "[n]o portion of the [Fund] shall ever inure to the benefit of any Employer or Union." *See* Oral Argument at 0:39–1:20; *see also* Appellants' Br. at 10, 32–33. The Fund led oral argument with its interpretation of this anti-inurement provision, which it argued "answers the entirety of the question in this litigation because it explicitly and unambiguously prohibits the alienation of trust assets caused by the judgment below." *Id.* The Fund characterized the anti-inurement provision as a definitive statement that "employers don't get money back out of this fund." Oral Argument at 8:02–8:10. However, the Fund also acknowledged that "the Trust Agreement does not have language saying specifically" that all contributions remain the property of the Fund upon termination of plan units within the Fund, though the Fund easily could have included such language. Oral Argument at 8:32–9:35.

In contrast, the Greenbrier focused on the termination provision of Plan Unit 155's 2004 and 2009 Rules and Regulations, which provides that "excess assets" either "will be used for purposes consistent with the purpose of the Plan as determined by the Trustees, or they may be transferred to another employee benefit fund providing similar benefits." Oral Argument at 24:00–24:57; *see also* Appellees' Br. at 10–14, 21. The Greenbrier identified this provision as the key, controlling provision in this dispute. Oral Argument at 26:00–26:15. The Trust Agreement is silent as to plan unit termination and the distribution of assets upon termination. Oral Argument 22:50–23:08. Thus, the termination provision in the Plan Unit 155 Rules and Regulations does not conflict in any way with the Trust Agreement. Oral Argument at 23:30–23:38. Further, this termination provision in the Rules and Regulations is part of the unique arrangement negotiated between the Greenbrier and the Fund. Plan Unit 155 "was drafted with the very clear concerns of the Greenbrier in mind," and was "designed for them." Oral Argument at 20:05–20:24; 22:42–22:46. "The Greenbrier did not agree to enter into one of the preexisting plan units that the Fund had at that time," instead insisting "very specifically, by the terms of the participation agreement and the Rules themselves" that it would have its own plan unit. Oral Argument, 22:21–22:42; *see* Appellees' Br. at 2–4. The 2012 amendment to the Plan Unit 155 Rules and Regulations was invalid and calculated to wrongfully deny the Greenbrier any of the excess assets. Oral Argument at 27:45–28:22. Thus, the Greenbrier argues that, relying on the pre-amendment termination provision read in light of the Greenbrier's unique plan unit arrangement, Plan Unit 155's excess assets must be remitted to the New Greenbrier Trust so that these assets can serve

28

"purposes consistent with the purpose of the Plan" and/or transfer "to another employee benefit fund providing similar benefits."

2.

We find the Greenbrier's position the more compelling when read as a contract dispute between the parties. Accordingly, we affirm the district court's order that the Fund must remit the excess assets, calculated at $5,503,181, to the New Greenbrier Trust for the benefit of qualified Greenbrier unionized employees.

First, we adopt the district court's mixed conclusion of fact and law that the December 2012 amendment to the Plan Unit 155 Rules and Regulations "was unreasonable, discriminatory, in bad faith, and made in violation of the Plan's amendment procedures." *Greenbrier Hotel Corp.*, 2016 WL 9779134, *12. The district court was best placed to make this fact-intensive inquiry, which was grounded in the court's evaluation of the credibility of witnesses on both sides of the dispute, and we find no reason to disturb its determination. Finding the amendment invalid, we consider here the remaining plan documents, including the 2004 and 2009 Rules and Regulations, various iterations of the Trust Agreement, and the parties' Participation Agreement.[6]

---

[6] We do not consider the SPD in our analysis because of the Supreme Court's clear direction that SPDs "do not themselves constitute the *terms* of the plan" and thus may not be enforced as such. *See CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis in original).

After a careful reading of the Trust Agreement, we conclude that it does not offer any guidance on the entitlement to distribution of a terminated plan unit's excess assets. Both parties agree that the Trust Agreement's terms would supersede the terms found in the Plan Unit 155 Rules and Regulations documents if they were to conflict. But since we find no trace of a statement about the distribution of excess assets upon termination of a plan unit, we find no conflict between the Trust Agreement and the other plan documents. Most significantly, we conclude that the anti-inurement provision that the Fund relies on primarily in support of its position does not preclude the transfer of excess assets to a similar employee welfare trust, such as the New Greenbrier Trust.

Next, we find no terms in the parties' Participation Agreement that speak specifically to the distribution of excess assets. However, we find significant the Participation Agreement's provisions that "The Greenbrier will be underwritten as an independent plan unit with the Welfare Fund" and that "[o]nly the claims utilization of The Greenbrier Plan . . . will be used in calculating future rates for The Greenbrier." These provisions serve as evidence that the Greenbrier's Plan Unit 155 was administered separately from the other plans and that, unlike the multiemployer plan units administered by the Fund, its assets would be accounted for separately.

Finding no terms in the Trust Agreement or the Participation Agreement that speak to the question of what happens to excess plan unit assets upon that plan unit's termination, we turn to the termination provision found in identical language in both the 2004 and 2009 Rules and Regulations documents. This termination provision states that:

30

> If there are any excess assets remaining after the payment of all Plan liabilities, those excess assets will be used for purposes consistent with the purpose of the Plan as determined by the Trustees, or they may be transferred to another employee benefit fund providing similar benefits.

Based on the definitions provided in the same Rules and Regulations documents, we read the term "Plan" to refer to "Plan Unit 155," not "the Fund's overall ERISA Plan." Accordingly, by these terms, excess assets must either "be used for purposes consistent with the purpose of [Plan Unit 155]" or "transferred to another employee benefit fund providing similar benefits." The purpose of Plan Unit 155 was to provide health care benefits to unionized employees of (only) the Greenbrier. The New Greenbrier Trust serves as an employee benefit fund, and its purpose is to provide similar benefits only to unionized employees of the Greenbrier. We find nothing ambiguous in the language of this provision. Under either prong of the termination provision, we conclude that Plan Unit 155's excess assets should be transferred to the New Greenbrier Trust. Even if this outcome would not follow were the Greenbrier to share a plan unit with one or more employers, we note that the Fund made exceptions to its usual policy to accommodate the Greenbrier's entry into the Fund, and these exceptions have consequences.

The district court found that Plan Unit 155's excess assets totaled $5,503,181, and we find no error in the court's fact finding on this point. Therefore, we affirm the district court's judgment ordering that the Fund transfer $5,503,181 to the New Greenbrier Trust, which will provide benefits similar to those that would have been provided through Plan Unit 155 to unionized Greenbrier employees and their qualifying beneficiaries.

31

In conclusion, after noting errors in the district court's legal analysis, we affirm only the district court's judgment that the Fund must transfer $5,503,181 in excess assets to the New Greenbrier Trust.

C.

Because we reach our conclusions above on non-ERISA grounds, we are compelled to vacate the award of attorney's fees and costs awarded pursuant to ERISA § 502(g), as detailed in the district court's May 12, 2017, order. *See Greenbrier Hotel Corp.*, 2017 WL 2058222.

III.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART AND VACATED IN PART.*